Judith F. **CARSTENS**, Kim M. Rue, W. R. Bray, J. Robert Schafer, and Sherill R. Rochford, Plaintiffs,

v.

Richard D. **LAMM**, as Governor of the State of Colorado; J. D. McFarlane, as Attorney General of the State of Colorado; and Mary Estill Buchanan, as Secretary of State of the State of Colorado, Defendants.

David T. **GOENS**, Janet Roberts, Jennie Sanchez, George Rosenberg, and Jean Galloway, Plaintiffs,

v.

Richard D. **LAMM**, as Governor of the State of Colorado, and Mary Estill Buchanan, as Secretary of State of the State of Colorado, Defendants.

Civ. A. Nos. 81–F–1713, 81–F–1870.

United States District Court,
D. Colorado.

Jan. 28, 1982.

---

Theodore S. Halaby, and Brian McConaty, Halaby & Bahr, Denver, Colo., for plaintiffs Judith F. Carstens, Kim M. Rue, W. R. Bray, J. Robert Schafer, and Sherill R. Rochford.

Edwin S. Kahn, and Stephen H. Kaplan, Kelly, Haglund, Garnsey, Kahn & Donnell, Denver, Colo., for plaintiffs David T. Goens, Janet Roberts, Jennie Sanchez, George Rosenberg, and Jean Galloway.

Deanna E. Hickman, Asst. Atty. Gen., Denver, Colo., for defendants Richard D. Lamm and J. D. McFarlane.

John L. Holm, Holm & Christensen, Denver, Colo., for defendant Mary Estill Buchanan.

Before McWILLIAMS, Circuit Judge, and FINESILVER and KANE, District Judges.

MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, District Judge:

In these consolidated cases, the Court is called upon to select a congressional redistricting plan for the State of Colorado. Following the tabulation of the 1980 decennial census, the Clerk of the United States House of Representatives informed the Governor of Colorado that the state, which currently has five representatives in Congress, was entitled to an additional congressional seat. Although the Governor and the General Assembly (sometimes referred to as the "State Legislature") made repeated attempts to develop an acceptable redistricting plan, both parties were unable to agree on the composition of the new districts. These suits were filed by several concerned citizens of Colorado in an effort to break the existing stalemate through judicial intervention.

After reviewing the testimony and evidence presented at trial, we conclude that the current congressional redistricting plan

set forth in C.R.S. 1973 § 2–1–101 is unconstitutional. The Court is of the view, however, that none of the plans submitted to the Court during the course of this litigation fully comport with the objectives and criteria which we feel should be incorporated in a judicially approved redistricting plan. As a result, the Court has fashioned its own plan which satisfies the relevant legal criteria and incorporates the most desirable aspects of the plans presented to the Court.

## I

## OVERVIEW OF THE LITIGATION

At the outset, we emphasize that "reapportionment is primarily a matter for legislative consideration and determination and that judicial relief becomes appropriate only when a legislature fails to reapportion to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *White v. Weiser*, 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973) (quoting *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964)). The State Legislature fulfilled this responsibility ten years ago when the bill creating the current congressional districts was passed by both houses in the General Assembly and signed into law by the Governor. *See* C.R.S. 1973 § 2–1–101. At that time, there were 2,209,596 people residing within the borders of this state, and the ideal population [1] of each district was 441,919.

Over the past ten years, however, the population of Colorado has grown at a rapid pace. According to the most current 1980 census figures, the population has increased by almost 700,000 people and now stands at 2,889,735.[2] Since this growth rate was proportionally greater than the average overall growth of the nation, Colorado was assigned an additional congressional seat during the decennial reapportionment [3] of the House of Representatives.

Under the provisions of both federal and state law, the primary responsibility for drawing new congressional districts lies with the State Legislature, subject to the approval of the Governor. 2 U.S.C. § 2c (1979)[4]; Colo.Const. art. V, § 44 (1973)[5]. Shortly after the Clerk of the House of Representatives issued the reapportionment mandate, the Governor and the General Assembly began to consider various methods of approaching the task of redistricting.[6]

---

1. The "ideal" district population is equal to the total state population divided by the total number of districts. *See* Wollock, ed., *Reapportionment Law and Technology* 6 (1980). [This pamphlet, prepared by the National Council of State Legislatures, in Denver, contains an excellent summary of the issues involved in congressional redistricting.]

2. Pursuant to an Order of the Panel dated January 7, 1982, the parties stipulated to the population of the State of Colorado based on the most recent revisions in the census data by the United States Census Bureau.

3. In its technical sense "reapportionment" refers to the redistribution of seats in established units of government, such as the United States House of Representatives. "Redistricting" signifies line-drawing to establish new districts within these units. Congress "apportions" the House of Representatives and the state "districts". *Kilgarlin v. Martin*, 252 F.Supp. 404, 10 n.1 (S.D.Tex.1966) *rev'd in part and remanded sub nom. Kilgarlin v. Hill*, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). *See* Bickerstaff, *Reapportionment by State Legislatures:*

*A Guide for the 1980's*, 34 Sw.L.J. 607, 608 (1980).

4. 2. U.S.C. § 2c (1967) states in pertinent part:

   In each state entitled ... to more than one Representative under an apportionment made pursuant to section 2a(b) of this title, there shall be established by law a number of districts equal to the number of Representatives to which such state is so entitled ....

5. Colorado Constitution, Article V, § 44 (1974) states:

   The general assembly shall divide the state into as many congressional districts as there are representatives in Congress apportioned to this state by the Congress of the United States for the election of one representative to Congress from each district. When a new apportionment shall be made by Congress, the general assembly shall divide the state into congressional districts accordingly.

   As to the role of the Governor in the redistricting process, see Section III, *infra.*

6. One of the early suggestions was the formation of a citizens' committee with the "respon-

By July 6, 1981, the first proposed plan, designated "H.B. 1615"[7], had passed both houses of the General Assembly. The Governor promptly vetoed the bill and sent the matter back to the Legislature for further study. His veto message urged the General Assembly to set aside partisan political considerations and develop a "fairer and more responsible plan for congressional redistricting." Exhibit 27a, Governor's Veto Message of H.B. 1615 dated June 12, 1981.

In response to the Governor's veto message, the Executive Committee of the State Legislative Council appointed an Interim Committee on Congressional Redistricting to review new proposals and make recommendations to the General Assembly[8]. After several days of meetings in early July, the Committee referred five plans to the General Assembly. Although the Governor notified the Legislature in advance that none of these plans was acceptable, one plan, designated "H.B. 1618"[9], was subsequently passed by both the State House of Representatives and Senate. The Governor vetoed the bill immediately upon receipt. He criticized the General Assembly for creating a highly partisan plan which would split the home counties of three incumbent Democratic representatives while giving "safe" districts to two incumbent Republicans. In addition to the political problems,

the Governor noted that the plan "needlessly [split] select counties and fail[ed] to respect important communities of interest." He urged the General Assembly to work together toward an acceptable compromise for the citizens of Colorado. Exhibit 27b, Governor's Veto Message of H.B. 1618 dated July 17, 1981.

The matter was sent back to the Legislature's Interim Committee on Congressional Redistricting which met for several days in August. The Committee reviewed a large number of proposals and ultimately selected three plans for referral to the entire Legislature. Despite warnings from the Governor that he could not approve any of the plans recommended by the Committee, the Legislature reconvened and passed a third plan, designated "H.B. 1624"[10], on September 22, 1981. Rather than veto the bill immediately, the Governor announced his intention to refrain from taking any action on the measure for ten days to allow for the possibility of a compromise.

Before any serious negotiations could begin, however, the first of these consolidated lawsuits, Civil Action No. 81–F–1713, was filed with the Court. The plaintiffs, Judith F. Carstens, Kim M. Rue, W. R. Bray, J. Robert Schafer and Sherill R. Rochford, are residents of each of the five current con-

sibility to formulate and recommend to the General Assembly a Congressional District Reapportionment Plan". Exhibit 28, Letter from Governor Richard D. Lamm to Fred E. Anderson and Carl B. "Bev" Bledsoe, dated January 28, 1981. This suggestion was never implemented.

7. H.B. 1615 is comprised of a "west slope" district which includes most of Boulder County (District 3), a consolidated city and county of Denver (District 1), an "east plains" district (District 4), and a divided Pueblo County (Districts 3 and 5). Its 2nd and 6th Districts include the areas immediately west and east of Denver, respectively, while the 5th District is located in central Colorado.

8. The Committee was comprised of seven Republicans and four Democrats, the latter appointed by the Republican majority in the Colorado Legislature. See Exhibit 25.

9. H.B. 1618 was the first legislatively passed plan to propose a north-south split in the City

and County of Denver (District 1). This plan also split Boulder County and the City of Boulder (Districts 3 and 4), Pueblo and the City of Pueblo (Districts 2 and 5), and created two narrow winding districts in central Colorado (Districts 2 and 5). Like 1615, this plan also recognized to a large extent an incorporated "west slope" and an "east plains" district.

10. H.B. 1624 splits Denver into two separate congressional districts in much the same fashion as H.B. 1618. This division is made along an east-west line (starting at Yosemite Street and generally running west along Colfax Ave.) which effectively cuts the city in half. H.B. 1624 also splits Boulder County between a metropolitan District 2 and an agricultural District 4. The city and the county of Pueblo are similarly divided between a west slope District 3 and a central District 5. Additionally, southern Jefferson County and Douglas County are included in the "west slope" district.

gressional districts. Their complaint seeks declaratory and injunctive relief against Governor Richard D. Lamm and Secretary of State Mary Estill Buchanan.[11] Specifically, plaintiffs (hereinafter referred to as the "Carstens plaintiffs") make three requests of this Court:

(1) to rule that C.R.S. 1973 § 2–1–101 is unconstitutional because it provides for only five congressional districts instead of the six districts mandated by the 1980 apportionment of the House of Representatives;

(2) to enjoin defendants from conducting either the primary or general congressional election for 1982 until Colorado is lawfully divided into six congressional districts; and

(3) to accept H.B. 1624, the most recent plan adopted by the Legislature, as the redistricting plan for Colorado in the event that the Governor and the Legislature could not agree on a compromise proposal in a timely manner.

Even the possibility of judicial intervention in the redistricting matter could not prompt the parties to reach an accord. On October 8, 1981, the Governor's ten-day grace period expired and he vetoed H.B. 1624. For the first time, however, the Governor's veto message not only included a critique of the rejected plan but also put forth a counter-proposal.[12] Exhibit 27c, Governor's Veto Message of H.B. 1624 dated October 8, 1981. The Governor subsequently met with leaders of the State Legislature to discuss the merits of his plan and the prospects for resolving the matter without judicial assistance.

In the meantime, several concerned citizens filed a second lawsuit on October 23, 1981. The new plaintiffs, David T. Goens, Janet Roberts, Jennie Sanchez, George Rosenberg and Jean Galloway (hereinafter referred to as the "Goens plaintiffs") are also residents of each of the five current congressional districts. Their complaint similarly requests this Court to enjoin the defendants, Governor Richard D. Lamm and Secretary of State Mary Estill Buchanan from conducting the primary or general congressional elections until a new redistricting plan has been adopted. In the absence of a compromise by the parties, the Goens plaintiffs asked the Court to adopt a plan which satisfied the following seven requirements: (1) population equality; (2) absence of racial discrimination and non-dilution of minority votes; (3) compactness; (4) contiguity; (5) preservation of county lines; (6) preservation of municipal boundaries; and (7) preservation of communities of interest. The Goens plaintiffs also urged the Court to adopt their proposed plan[13] which complied with the seven stated criteria or, in the alternative, to implement provisions of 2 U.S.C. § 2a(c)(2) (1979). Under this federal statute, the state would elect the "additional Representative ... from the state at large and the other Representatives from the districts then prescribed by the law of the state." 2 U.S.C. § 2a(c)(2) (1979).

Negotiations between the Governor and the General Assembly continued throughout the month of October and culminated in a settlement conference at the federal courthouse on November 6, 1981. At the end of

---

11. Colorado State Attorney General J. D. McFarlane was initially named as defendant in the *Carstens* suit but was dismissed by stipulation of the parties prior to trial.

12. This plan, designated "Governor's Proposal A", more closely resembles Colorado's current congressional scheme than any other. While it contains a "west slope" district (District 3), the east plains are divided in a north-south configuration (Districts 4 and 5). The 5th District extends from the Continental Divide east to the Colorado-Kansas border and south to the Colorado-New Mexico-Oklahoma border. Denver is kept intact (District 1), although Aurora is not.

13. The plan submitted by the Goens Plaintiffs is comprised of a "west slope" (District 3) and an "east plains" district (District 4), a consolidated City and County of Denver (District 1), a 2nd District of Boulder, Adams County and South Weld County, a 6th district comprised of the suburban municipalities to the west, south and east of Denver, excluding a portion of Aurora, and a 5th district in largely mountainous central Colorado.

this conference, both the Governor and the leaders of the General Assembly conceded that there was no hope of reaching a compromise.[14] The two lawsuits were subsequently consolidated, and the case was set for trial on December 3rd and 4th. In the ensuing weeks, twenty-two plans [15] were submitted to the Court for consideration. At trial, however, testimony focused on five major plans: H.B. 1624,[16] submitted by Carstens plaintiffs; the Goens plan,[17] submitted by the Goens plaintiffs; Governor's Proposal A [18] and the GRC plan,[19] submitted by defendant Lamm; and the McPhee Plan # 2,[20] submitted by a private citizen.

14. The transcript of that conference includes the following colloquy:

> THE COURT: Mr. Halaby [counsel for the Carstens plaintiffs], do you hold out any hope for a resolution or compromise?
> MR. HALABY: Through the legislative process?
> THE COURT: Yes. ·
> MR. HALABY: I'm afraid I would have to say no.
> THE COURT: [To Ms. Hickman, counsel for the defendant Lamm] Please.
> MS. HICKMAN: No, your Honor, we don't.
> \* \* \* \* \* \*
> THE COURT: Mr. Strahle [Majority Leader in the Colorado House of Representatives]
> \* \* \* \* \* \*
> I take it this reflects your feelings and the feelings of the other legislative leadership as expressed by Mr. Halaby; is that correct?
> MR. STRAHLE: Unfortunately, yes.
> THE COURT: ...I am satisfied that the legislative leadership, the Governor's office, the Attorney General and the amicus [later to become the Goens plaintiffs] have made every good effort to try to reach an agreement today, and apparently it is not forthcoming.

15. The Court has reviewed the following plans: (1) H.B. 1615; (2) H.B. 1618; (3) H.B. 1624; (4) the Lillpop Plan No. 6E; (5) the A–2 Plan; (6) the B–2 Plan; (7) the K Plan; (8) the K Revised 3 Plan; (9) the Callaway Equal Districts Plan; (10) the Yost Plan 1A; (11) the P/S Plan; (12) the Governor's Proposal A; (13) the GCR Plan; (14) the Groff Plan; (15) the Pena-Groff Plan # 2; (16) the Goens Plan; (17) the McPhee Plan # 1; (18) the McPhee Plan # 2; (19) a plan submitted by Waldo Smith; (20) a plan submitted by Richard E. Wanek; and (21) a plan submitted by Herrick S. Roth.

16. *See* note 10, supra.

17. *See* note 13, supra.

## II

## JURISDICTION

The parties agree that this Court has jurisdiction over plaintiffs' claims for declaratory relief pursuant to 28 U.S.C. § 2201 and 2202 (1979). Jurisdiction over plaintiffs' equitable claims is based on 28 U.S.C. §§ 1343(3), 1343(4) (1979) and 42 U.S.C. §§ 1983 and 1988 (1979). Because this case challenges the constitutionality of the current apportionment of Colorado's congressional districts, a three-judge court was convened in accordance with the provisions of 28 U.S.C. § 2284(a) (1979).[21]

18. *See* note 12, *supra.*

19. The GCR Plan, an acronym for Mssrs. Gilmore, Coddington and Ryan, the experts who prepared the plan for defendant Lamm, is similar to the plan submitted by the Goens plaintiffs. Denver is kept intact (District 1) although Boulder County is split (Districts 2 and 4). The west slope district (District 3) includes Pueblo and a bizarrely split Las Animas County. The 4th District contains most of the eastern agricultural counties and the 5th District is comprised of the central Colorado mountainous region plus El Paso County. District 6 includes all the suburban municipalities to the west, south and east of Denver, with the exception of northern Aurora.

20. The McPhee Plan No. 2 was devised by Professor William McPhee as a revision of an earlier plan submitted by him. This plan generally includes all of Colorado west of the foothills in a "west slope" district (District 3), incorporates the agricultural east plains in a single district (District 4), and forms the other four districts in a narrow strip along the front range, including a north-south division of Denver similar to H.B. 1624. District 2 includes the city of Boulder and the large municipalities to the west and northeast of Denver, and District 5 includes Colorado Springs and most of Pueblo.

21. 28 U.S.C. § 2284(a) (1976) states in pertinent part:

> A district court of three judges shall be convened ... when an action is filed challenging the constitutionality of the apportionment of congressional districts ....

On November 2, 1981, the Honorable Oliver Seth, Chief Judge of the United States Court of Appeals for the Tenth Circuit issued an order appointing Judges Robert H. McWilliams, Sherman G. Finesilver and John L. Kane, Jr. to the panel in the instant case.

## A. Ripeness

Defendant Buchanan contends that the Legislature and the Governor have not had a full opportunity to act on redistricting Colorado, and therefore, the case before the Court is not ripe for adjudication. According to Buchanan, the Legislature and the Governor "may well" reach an accord on redistricting if they are given more time. Plaintiffs, however, point out that Colorado's congressional districts must be finalized prior to certain precinct and primary deadlines.[22] They argue that the Court cannot wait to take action on this matter until those deadlines expire.

■ Ripeness is an amorphous legal concept subject to many "subtle pressures including the appropriateness of the issues for decision by this Court and the actual hardship to the litigants of denying them the relief sought." *Poe v. Ullman*, 367 U.S. 497, 508, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961). *See also, Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *In re Grand Jury*, 604 F.2d 69 (10th Cir. 1979). The central concern of a ripeness inquiry is "whether there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality" to warrant the attention of the Court. *Lake Carriers Ass'n. v. MacMullan*, 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). As a general rule, the Court will not review matters involving uncertain and contingent future events that may not occur as anticipated or may not occur at all. *See* Wright & Miller, *13 Federal Practice & Procedure*, § 3532, p. 238 (1975).

In the instant case, the Governor and the State Legislature have had ample opportunity to redistrict Colorado to provide for an additional representative. The Legislature has passed three different redistricting proposals, all of which were subsequently vetoed by Governor Lamm. No attempt was made to override these vetoes. Despite months of deliberate study and negotiations, the people of Colorado still do not have an acceptable congressional redistricting plan.

■ We are persuaded that the fate of redistricting in Colorado has reached an impasse which the parties are not capable of resolving. At the end of the November 6 negotiating session in the federal courthouse, the parties agreed that it "would do neither side any . . . good to negotiate . . . further". Transcript, Hearing of November 6, 1981, p. 3. Moreover, at trial Representative Ronald Strahle, Majority Leader of the Colorado House of Representatives testified that it was "highly remote" that the Governor and the Legislature would ever agree on an acceptable redistricting plan. This assessment was never challenged.

The hardship to the parties and to the people of Colorado is evident. There is no dispute that the current posture of Colorado's congressional districts is unconstitutional. If an acceptable redistricting plan is not adopted, the only alternative would be to hold the 1982 congressional elections pursuant to district lines which are patently offensive to the long-established principle of "one person-one vote". Thus, this Court is presented with a controversy of immediate concern. There is no indication that absent judicial intervention, a viable solution will be forthcoming. Considering the nature of the issues presented for decision and the hardship to the parties, we find that the redistricting question is ripe for adjudication.

---

22. These deadlines include: (1) April 1, 1982—The last day for County Commissioners to alter precinct boundaries in conformance with congressional district lines [C.R.S.1973, § 1-6-101]; (2) May 3, 1982—precinct caucus day [C.R.S.1973, § 1-3-102(1)]; (3) May 13 to June 2, 1982—First and last day to hold county assembly [C.R.S.1973, § 1-4-602(1)]; (4) July 1, 1982—Last day for the political party's congressional assembly to designate candidates for Congress [C.R.S.1973, § 1-4-601]; (5) September 14, 1982—Congressional primary election; and (6) November 2, 1982—General election.

## B. Applicability of 2 U.S.C. § 2a(c)(2)

One possible short term solution to the redistricting dilemma is contained in 2 U.S.C. § 2a(c)(2) (1979). This federal statute declares, "until a state is redistricted in the manner provided by the law thereof after any apportionment, . . . if there is an increase in the number of representatives, such additional representative or representatives shall be elected from the state at large and the other representatives from the districts then prescribed by the law of such State." Defendant Buchanan maintains that even if this matter is ripe for review, this Court must defer to the directives of this statute and dismiss the case.

The Carstens plaintiffs claim that this Court is not constrained by the provisions of 2 U.S.C. § 2a(c)(2) because the measure was impliedly repealed when Congress passed 2 U.S.C. § 2c in 1967. Section 2c provides, "In each state entitled . . . to more than one representative under an apportionment, . . . there shall be established by law a number of districts equal to the number of representatives to which such state is entitled, and Representatives shall be elected only from districts so established, no district to elect more than one representative . . ." On its face, Section 2c appears to prohibit at-large elections under any circumstances since the number of districts and the number of representatives must always be equal.

■ We are of the view that these two statutes are not necessarily inconsistent and do not preclude this Court from considering the redistricting dilemma. Section 2c prohibits a legislature or court from deliberately designing a redistricting plan which would elect at-large representatives. Arguably, Congress did not repeal Section 2a(c)(2) because they did not want to leave a state without a remedy in the event that no constitutional redistricting plan exists on the eve of a congressional election, and there is not enough time for either the Legislature or the courts to develop an acceptable plan.[23] In this very limited circumstance, we believe that Section 2a(c)(2)

---

**23.** *But see Shayer, et al. v. Kirkpatrick, et al.,* 541 F.Supp. 922, No. 81–4144–CV–C (W.D.Mo. Jan. 7, 1982). In *Shayer,* a three-judge court considered the applicability of 2 U.S.C. § 2a(c)(5) in a suit challenging the constitutionality of Missouri's existing congressional districts. Section 2a(c)(5) provides:

> (c) Until a State is redistricted in the manner provided by the law thereof after any reapportionment, the Representatives to which such state is entitled under such apportionment shall be elected in the following manner:

> * * * * * *

> (5) if there is a decrease in the number of Representatives and the number of districts in such State exceeds such decreased number of Representatives they shall be elected from the State at large.

The Missouri court concluded that § 2a(c)(5) was not applicable inasmuch as it was inconsistent with the § 2c prohibition of at-large elections and, thus, repealed by implication. The Court relied in part on the following colloquy between Senator Howard Baker of Tennessee and Senator Birch Bayh of Indiana during the floor debate on § 2c:

> Mr. Baker: [2 U.S.C. § 2c] strictly provides in a straightforward manner that when there is more than one member of the House of Representatives from a state, the state must be districted, and the members may not run at large.

* * * * * *

Mr. Bayh: Suppose a state legislature does not do it [redistrict]. Does the Senator not think that, to be consistent, we should say that the Federal Court should not be permitted to reapportion a state and let all the legislators run at large?

Mr. Baker: With respectful deference to my colleague, I think not; because I believe that you are then running afoul of the very problem that is created by occasional failure of state legislatures to adhere to the provisions of Article I of the Constitution.

* * * * * *

Mr. Bayh: . . . I just wish to make one brief comment in summary, in light of the colloquy.

This will make it mandatory for all Congressmen to be elected by single-member districts, whether the reapportionment is done by the state legislatures or by a Federal Court.

Mr. Baker: That is my understanding.

*Shayer, supra,* slip opinion at pp. 7–8, at pp. 926–27. We do not feel that these comments, or any of the congressional debate on § 2c necessarily indicate a desire on the part of Congress to repeal § 2a(c)(2). A persuasive argument can be made that the statute is a stop-gap measure to be utilized in the limited circumstances discussed above.

provides emergency statutory relief from an otherwise unconstitutional situation. There is nothing in the language of Section 2a(c)(2) which indicates that Congress intended to bar the federal courts from providing timely assistance to the state in resolving a redistricting dispute. Since the posture of this case does not require the use of such a drastic emergency remedy, we find that Section 2a(c)(2) is not applicable here.

## III

### ISSUES

The issues in this case can be divided into two broad categories. The first category defines the scope of the Court's authority to act while the second category delineates the criteria which form the basis of the Court's decision.

A. The Scope of the Court's Authority to Act

Although we have established that this Court has jurisdiction to rule on the redistricting dispute, it is also important to determine the scope of the Court's authority in this matter. According to the Carstens plaintiffs, our authority is somewhat limited. Since redistricting is primarily the responsibility of the State Legislature, they argue that H.B. 1624, the last legislative pronouncement, represents current state policy on redistricting and should receive priority during the Court's deliberations.

Carstens plaintiffs claim that courts in general have paid great deference to the "studied and thoughtful approach" to redistricting provided by the legislative process. As examples of instances in which a court has deferred to the legislature, they cite *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973) and *Donnelly v. Meskill*, 345 F.Supp. 962 (D.Conn.1972). These cases fail to support Carstens' position.

24. Carsten's reference to *Graves v. Barnes*, 446 F.Supp. 560 (W.D.Tex.1977) can be dismissed on similar grounds.

25. *Donnelly* was decided in mid-July with the November election less than four months away.

In *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), the Supreme Court reversed a three-judge district panel's selection of a redistricting plan because that plan "broadly brush[ed] aside state apportionment policy without solid constitutional or equitable grounds for doing so." *Id.* at 796, 93 S.Ct. at 2355. The case is not controlling, however, because the "state apportionment policy" referred to by the Court was embodied in a plan which not only had been passed by the State Legislature but also had been signed into law by the Governor. *Id.* at 784, 93 S.Ct. at 2349. In the instant case, H.B. 1624 was approved by the General Assembly but vetoed by the Governor.[24]

Although *Donnelly v. Meskill*, 345 F.Supp. 962 (D.Conn.1972), another case cited by the Carstens plaintiffs, is factually similar to the situation before this Court, *Donnelly* is also distinguishable. In that case, the Court was required to select one of three plans submitted after the Legislature's redistricting bill had been vetoed by the Governor. The plan chosen by the Court contained districts "essentially as outlined by the legislature, with adjustments necessary to bring about virtually complete population equality." *Id.* at 965. While the Court felt that this essentially legislative plan was constitutionally sound and workable, it concluded, "if time permitted extended hearings before the court or extended consideration by a court-appointed master, a better plan might be devised, weighing all possible factors." *Id.* at 965. In the instant case, the Court has solicited extensive submissions from the parties and does not face the same severe time constraints[25] which confronted the *Donnelly* court. Thus, we do not feel that the holding in either *White* or *Donnelly* compels us to give priority to H.B. 1624, particularly if a better plan is available.

The instant case, however, was filed well over a year before the 1982 Colorado congressional election, allowing the Court sufficient time to fashion appropriate relief.

■ Congressional redistricting is a law-making function subject to the state's constitutional procedures. *Koenig v. Flynn,* 285 U.S. 375, 52 S.Ct. 403, 76 L.Ed. 805 (1932). *See also Smiley v. Holm,* 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932). The *Colorado Constitution* explicitly provides that every bill passed by the General Assembly shall be signed by the Governor before it becomes law.[26] Colo.Const. art. IV, § 11. There is no authority conferred upon the General Assembly "to create congressional districts independently of the participation of the Governor as required by the state constitution with respect to the enactment of laws." *Smiley,* 285 U.S. at 373, 52 S.Ct. at 401. *Accord, State ex rel. Reynolds v. Zimmerman,* 22 Wis.2d 544, 126 N.W.2d 551 (1964).

■ As a result, H.B. 1624, which certainly is entitled to careful consideration by this Court, cannot represent current state policy any more than the Governor's proposal. Both the Governor and the General Assembly are integral and indispensable parts of the legislative process.[27] To take the Carstens' position to its logical conclusion, a partisan state legislature could simply pass any bill it wanted, wait for a gubernatorial veto, file suit on the issue and have the Court defer to their proposal.

This Court will not override the Governor's veto when the General Assembly did not do so.[28] Instead, we regard the plans submitted by both the Legislature and the Governor as "proffered current policy"[29] rather than clear expressions of state policy and will review them in that light.

### B. The Criteria

■ The primary goal of an acceptable congressional redistricting plan should be "fair and effective representation of all citizens." *Reynolds v. Sims,* 377 U.S. 533, 565–66, 84 S.Ct. 1362, 1383, 12 L.Ed.2d 506 (1964). Prior to the early 1960's, the Supreme Court refused to get involved in the predominantly political cases which challenged the composition of legislative or congressional districts. *See e.g., Colgrove v. Green,* 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946).[30] The disparities in the composition of districts in some states became so great, however, that the Court was forced to intervene in order to protect the integrity of the legislative system. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).[31] Development of the criteria which currently govern congressional redistricting began shortly thereafter with *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

**26.** The legislature, by a two-thirds majority, can override the Governor's veto. Colo.Const., art. IV, § 11.

**27.** "The propriety of the thing does not turn upon the supposition of superior wisdom or virtue in the executive, but upon the supposition that the legislature will not be infallible; that the love of power may sometimes betray it into a disposition to encroach upon the rights of the other members of the government; that a spirit of faction may sometimes pervert its deliberations; that impressions of the moment may sometimes hurry it into measure which itself on mature reflection would condemn." A. Hamilton, *The Federalist* 495 (Jacob Cooke, ed. 1961).

**28.** *Cf.. Legislature of California v. Reinecke,* 6 Cal.3d 595, 99 Cal.Rptr. 481, 492 P.2d 385 (1972).

**29.** *Sixty-Seventh Minnesota State Senate v. Beens,* 406 U.S. 187, 197, 92 S.Ct. 1477, 1484, 32 L.Ed.2d 1 (1972).

**30.** In *Colegrove,* a sharply divided Court refused to consider claims that Illinois congressional districts were unconstitutional due to the state's failure to reapportion. Justice Frankfurter, writing for the majority, warned that it would be "hostile to a democratic system to involve the judiciary in the politics of the people". *Colegrove,* 328 U.S. at 553–54, 66 S.Ct. at 1200.

**31.** In *Baker,* the Court held that the federal courts had jurisdiction to hear a suit filed by a citizen of Tennessee alleging that the state's failure to update the 1901 apportionment of the state legislature "debased" his constitutional right to vote. At the time Baker's suit was filed, Tennessee's three million residents were divided into legislative districts ranging in size from 42,298 to 2,340. Tennessee was not unique in this regard. Population disparities of 10 to 1 or higher were common in the legislative and congressional districts of most states. Dixon, *Fair Criteria and Procedures for Establishing Legislative Districts,* 9 Policy Studies Journal 839, 843 (Special Issue # 3, 1980–81).

In *Wesberry*, several citizens challenged the gross population disparities in Georgia's congressional districts which ranged in size from 823,680 residents in the largest district to 272,154 residents in the smallest district. These individuals claimed that their right to vote had been diluted by the failure of the Georgia Legislature to realign each district to equalize the population. The Supreme Court agreed and established population equality as the first relevant constitutional standard for congressional redistricting. The Court held, "the command of Article I, Section 2 that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as anothers." *Id.* at 7–8.

Over the next few years, the Court attempted to define the acceptable parameters of population deviation under the "one person, one vote" principle. Although the Court seemed to assume that equal representation was synonymous with equal population, it steadfastly refused to quantify the criteria announced in *Wesberry* as a fixed or numerical percentage. In *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), the Court invalidated a Missouri congressional redistricting plan with an overall population deviation of 5.97%.[32] Justice Brennan declared that *Wesberry*'s "as nearly as practical" standard required "the State [to] make a good

faith effort to achieve precise mathematical equality" and "[to] justify each variance, no matter how small." *Id.* at 530–31, 89 S.Ct. at 1228. The Court concluded that the population variances among the Missouri congressional districts were unacceptable and could not be justified by the state's attempt to avoid fragmenting political subdivisions or areas with distinct economic and social interests, to recognize projected population shifts, to ensure geographically compact districts, or to achieve a reasonable legislative compromise. *Id.* at 533–36, 89 S.Ct. at 1230.

Similarly, in *Wells v. Rockefeller*, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969), the Court invalidated a New York congressional redistricting plan with a total population deviation of 13.095%[33]. In that case, New York did not claim that the Legislature had made a good faith effort to achieve mathematical equality. Instead, the state attempted to justify existing deviations by creating districts with specific interest orientations. The Court rejected this argument as "antithetical to the basic premise of the constitutional command to provide equal representation for equal numbers of people." *Id.* at 546, 89 S.Ct. at 1237.

Although the Court has accepted greater population deviations for state legislative districts[34], it seems preoccupied with the notion of precise mathematical equality for congressional districts. The most recent de-

**32.** Throughout this opinion, we will refer to the "overall population deviation" or "total population deviation" in a specific case or plan as the term has been used by the Supreme Court. To arrive at this figure, we first calculated the difference in population between the largest and smallest districts and divided the result by the ideal population. *See* note 1, *supra*.

In *Kirkpatrick*, for example, the largest district drawn by the Missouri legislature had a population of 445,523, while the smallest contained 419,721. The difference between the two districts is 25,802. When this figure is divided by the ideal population (431,981), the result is .0597. Converted to a percentage, the "total population deviation" of the Missouri legislature's plan is 5.97%.

**33.** In *Wells*, the largest district drawn by the New York legislature contained 435,880 people, while the smallest numbered 382,277. The difference between these two districts (53,603)

divided by the ideal population (409,324) yields a quotient of 0.13095. Converted into a percentage, the total population deviation in the New York legislature's plan is 13.095%.

**34.** *See Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 760 (1975) (the Court sustained an overall relative deviation of 20.14% in the North Dakota State House districts); *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (the Court sustained an overall relative deviation of 9.9% in the Texas state House districts); *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (the Court sustained an overall relative deviation of 7.83% in the Connecticut state House districts); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) (the Court sustained an overall relative deviation of 16.4% in the Virginia state House districts).

cision on this issue not only affirmed the strict standard enunciated in *Kirkpatrick* and *Wells*, but also tightened the range of acceptable variances. In *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), the Court rejected a Texas redistricting plan with an overall population variance of 4.13% in favor of a plan with a total deviation of 0.149%.[35]

The current status of the population equality standard is perhaps best described as entrenched ambiguity. No one will deny that it is the "pre-eminent, if not the sole, criterion on which to adjudge [the] constitutionality" of congressional redistricting plans. *Chapman v. Meier*, 420 U.S. 1, 23, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975). The precise point at which a plan passes into the range of acceptable population deviation remains undefined and presumably varies with the plan. In applying this standard, however, the district courts tend to invalidate deviations which are greater than those found in *Kirkpatrick* and *Wells*. *See e.g., David v. Cahill*, 342 F.Supp. 463 (D.C. N.J.1972) (total population deviation of 12.41%); *Skolnick v. Illinois State Electoral Board*, 307 F.Supp. 698 (N.D.Ill.1969) (total population deviation of approximately 13.6%). Conversely, plans with lower population variances have been approved. *See e.g., Dunnell v. Austin*, 344 F.Supp. 210 (E.D.Mich.1972) (total population deviation of .01005%); *Drum v. Scott*, 337 F.Supp. 588 (M.D.N.C.1972) (total population deviation of 3.79%); *West Virginia Civil Liberties Union v. Rockefeller*, 336 F.Supp. 395 (S.D. W.Va.1972) (total population deviation of 0.07865%); *Skolnick v. State Electoral Board of Illinois*, 336 F.Supp. 839 (N.D.Ill. 1971) (total population deviation of 1.144%).

■ The second constitutional criteria used in analyzing redistricting plans developed out of the realization that sheer mathematical equality may not adequately protect minority rights. Although no group has a constitutional right to be represented in a legislative body in direct proportion to its numerical voting strength[36], the Court began to recognize that district lines could be drawn in a manner which would "minimize or cancel out the voting strength of racial or political elements of the . . . population." *Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965). *See also Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). Thus, plans which satisfy equal population requirements may still be vulnerable to attack on the issue of invidious racial discrimination.

■ Unlike population equality which is capable of quantifiable verification, dilution of minority voting strength addresses the quality of representation and cannot be established through simple numerical tests. *Whitcomb*, 403 U.S. at 142, 91 S.Ct. at 1868 (1971). Instead, the court must determine whether there is sufficient "evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did residents in the district to participate in the political processes and to elect legislators of their choice." *White v. Regester*, 412 U.S. 755, 765–66, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973). The constitutionally protected right is one of equal access to the political process.

In the instant case, the parties have not challenged an existing redistricting plan on the basis of invidious racial discrimination. Therefore, we find it unnecessary to explore the nuances of proof needed to support such a claim. We are, however, acutely aware of the potential for minimizing the voice of minority populations in the development of redistricting plans and have carefully reviewed all of the proposals sub-

**35.** In *White,* the population of the largest and smallest districts in the plan accepted by the Court were 400 and 296, respectively. The difference of 696 divided by the ideal population of 466,530 is .00149. Converted into a percentage, the total population deviation of the *White* plan is 0.149%.

**36.** *See City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

mitted to the court with this issue in mind.[36a] In our view, a redistricting plan which satisfies this criteria should not fracture a natural racial or ethnic community or otherwise dilute minority voting strength.

These two constitutional criteria, population equality and absence of racial discrimination, have formed the foundation of judicial analysis on this issue for almost two decades. While the integrity of these standards has never been seriously challenged, the lower courts have frequently been forced to resort to additional non-constitutional criteria in their comparisons of proposed congressional plans. The degree of sophistication in redistricting technology has reached a point where it can match the courts' increasing demands for mathematical precision. As a result, courts are often faced with situations in which several different redistricting plans achieve virtually identical levels of population equality without substantially diluting minority rights.[36b] In these cases, no reasoned decision can be based solely on these two constitutional criteria. The court must accommodate other relevant criteria in determining whether to accept a proposed plan or to adopt a new one.

■ Therefore, we decided to evaluate the plans submitted to the Court on the basis of several additional non-constitutional criteria. These criteria can be grouped into three categories: 1) compactness and contiguity; 2) preservation of county and municipal boundaries, and 3) preservation of communities of interest. Selection of these criteria was based primarily upon their successful use in other redistricting cases. See e.g., David v. Cahill, 342 F.Supp. 463 (D.C.N.J.1972); Preisler v. Secretary of State of Missouri, 341 F.Supp. 1158 (W.D. Mo.1972); Skolnick v. State Electoral Board of Illinois, 336 F.Supp. 839 (N.D.Ill.1971). We note, as well, that both the Governor and the State Legislature's Interim Committee on Congressional Redistricting considered these factors important enough to include them on lists of guidelines to be used in developing proposed plans.[37] In ad-

---

**36a.** An additional factor which should be mentioned in our analysis of minority representation is the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq. (1979). This legislation "designed by Congress to banish the blight of racial discrimination in voting," requires covered jurisdictions to seek the approval of the United States Attorney General or of a three-judge court in the District of Columbia before implementing new voting procedures. South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). A county becomes subject to these "preclearance" requirements whenever the Justice Department determines that certain conditions, indicative of racial discrimination in voting, are present in the area.

El Paso County is the only jurisdiction in the state of Colorado which is currently subject to preclearance procedures under the Act. Defendant Buchanan explained that these requirements were imposed on El Paso several years ago because (1) more than 5% of the residents of voting age were members of a single language minority and (2) less than 50% of the residents of voting age cast ballots in the 1970 Presidential election. Buchanan claims that since these conditions have now been remedied, this Court should "exercise its equitable powers to declare that the State of Colorado is no longer subject to preclearance" requirements. Buchanan's Closing Arguments, p. 3–4.

We decline to rule on the current status of El Paso County under the Voting Rights Act. Because the Court has fashioned its own plan rather than implementing a legislative proposal, the preclearance requirements of the Act are not applicable in the instant case. McDaniel v. Sanchez, 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981).

**36b.** For example, a three-judge district panel in Illinois was recently presented with four plans which ranged in total population deviation from .02851% to .14797%. See In Re Illinois Congressional Districts Reapportionment Cases, No. 81–C–3915 (N.D.Ill. December 3, 1981), judgment aff'd, sub. nom. Ryan v. Otto and McClory v. Otto, —— U.S. ——, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982).

**37.** In his July 17, 1981, veto message of H.B. 1618, Governor Lamm suggested these guidelines:

The primary factor in any redistricting plan is obviously that of population equality. In realizing this numerical equality, city and county boundaries should be followed to the maximum extent possible. Districts should be compact to the maximum possible extent. The voting effectiveness of minority groups must not be diminished or diluted. Incumbents should not be granted special favorable treatment, but neither should they be subject to punitive treatment.

dition, the people of Colorado have adopted an amendment to the state constitution which endorses the use of similar criteria in state reapportionment cases.[38]

Throughout this litigation, Carstens plaintiffs have criticized the use of non-constitutional criteria in analyzing redistricting plans. They argue that there are internal conflicts inherent in such criteria which make their use subjective and impractical. We do not find these arguments persuasive. When faced with potentially conflicting interests, courts generally attempt to achieve an equitable result by using a balancing test. *See David v. Cahill*, 342 F.Supp. 463 (D.C.N.J.1972); *Skolnick v. State Electoral Board of Illinois*, 336 F.Supp. 839 (N.D.Ill. 1971). If conflicts do, in fact, occur when these criteria are applied to redistricting plans, we are convinced that balancing the competing interests represents a realistic and practical means for resolving any potential problems.

## IV

## GEOGRAPHIC AND DEMOGRAPHIC PROFILE OF COLORADO

Before proceeding to critique the plans submitted to the Court under the criteria outlined above, it is important to review the topography and population distribution of the state. An understanding of geography and demographics is important to the development of a rational state policy for redistricting Colorado.

Geographically speaking, the state is divided into three principal regions: (1) eastern plains, (2) western slope and (3) Rocky Mountains and Continental Divide. The eastern portion of Colorado (generally referred to as the eastern plains) covers more than one-third of the state's land area. This region has flat plains and broad rolling prairies which gradually rise to the foothills and the mountain ranges (on the west) that divide the state. A combination of physical and economic geography influences the eastern portion of the state. These high plains are bisected by two prominent river valleys, the Arkansas and South Platte, which have been dominant forces in the development of this region. The people in the area are dependent on these two rivers for their water supply which is their economic base.

The western third of Colorado (commonly referred to as the western slope) consists of

Exhibit 27c.

The Interim Committee on Congressional Redistricting of the Colorado State Legislature adopted the following criteria on August 19, 1981:

In consideration of congressional redistricting plans, the committee shall observe the following two requirements:

(a) population equality in each district; and
(b) avoidance of overt dilution of minority voting strength.

In consideration of congressional redistricting plans, the committee may recognize as desirable but not binding, the following elements of a plan:

(a) an attempt, insofar as practical, to avoid splitting county boundaries;
(b) an endeavor, insofar as practical, to draw compact districts;
(c) an attempt should not be made to draw plans for the specific purpose of rewarding or penalizing incumbents;
(d) to the extent practical, the plan should respect communities of interest and
(e) other desirable elements which may be brought to the attention of the committee.
Exhibit 25a.

38. Colorado Constitution, Article V, § 47 states:

Composition of districts. (1) Each district shall be as compact in area as possible and the aggregate linear distance of all district boundaries shall be as short as possible. Each district shall consist of contiguous whole general election precincts. Districts of the same house shall not overlap.

(2) Except when necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts. Within counties whose territory is contained in more than one district of the same house, the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible. When county, city or town boundaries are changed, adjustments, if any, in legislative districts shall be as prescribed by law.

(3) Consistent with the provisions of this section and section 46 of this article, communities of interest, including ethnic, cultural, economic, trade area, geographic, and demographic factors, shall be preserved within a single district wherever possible.

alpine terrain interspersed with wide valleys, rugged canyons, high plateaus and deep basins. Like the eastern plains, the west slope contains two prominent river systems, the Colorado and the Gunnison, which converge at the city of Grand Junction, the major population center of the western slope.

The Rocky Mountains cut through the middle third of Colorado from north to south and also rise in the northwestern corner of the state. Fifty-five peaks which tower 14,000 feet or more above sea level are found in this mountainous area. The Continental Divide, a line of mountain summits which separates streams flowing toward the Pacific Ocean and the Gulf of California from those flowing toward the Gulf of Mexico, traverses the west central part of the state. This world famous Divide is crossed by a limited number of highways which are open year round. As a result, the Divide has a substantial effect on the distribution of Colorado's population. The geographic location and physical characteristics of the Divide must therefore be a realistic consideration in any redistricting plan.

The distribution of the state's population over Colorado's broad and varied geographic spectrum is truly unique. Nine of the state's 63 counties contain approximately 80 percent of the state's total population. These nine counties (Adams, Arapahoe, Boulder, Denver, El Paso, Jefferson, Larimer, Pueblo and Weld) are located along the narrow strip of the eastern front range of the Rocky Mountains. The other 20 percent of the state's population is distributed over a vast geographic area. The retail trade centers, educational institutions, and recreational facilities of the front range counties, however, act as the lifeblood for a major portion of the state.

With these facts in mind, we will now examine the plans submitted to the Court under the criteria we outlined above.

## V

### CRITIQUE OF THE PLANS UNDER COURT–ADOPTED CRITERIA

#### A. The Constitutional Criteria

The first constitutional criteria, population equality, has not been a topic of dispute during the course of this litigation. All of the plans submitted to the Court made a "good faith effort" to comply with this requirement. *See Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); *Wells v. Rockefeller*, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969). If the 0.149% total deviation figure accepted by the Supreme Court in *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), is used as a benchmark, each of the plans fall well within constitutional limits.

The overall population deviation figures range from a low of 7 people or .0015% on H.B. 1624 to a high of 15 people or .0031% on the Governor's Plan.[39] In simple terms, these figures mean that the drafters of H.B. 1624, the most exacting plan in population terms, came within fifteen one-thousandths of a percent of being able to split the state into six equal congressional dis-

---

**39.** The following table summarizes the overall population deviation figures for the five major plans discussed at trial:

| Plan | Population of Largest District | Population of Smallest District | Difference | Total Population Deviation (percentage) |
|---|---|---|---|---|
| H.B. 1624 | 481,625 | 481,618 | 7 | .0015% |
| Goens | 481,628 | 481,616 | 12 | .0025% |
| Governor's Proposal A | 481,629 | 481,614 | 15 | .0031% |
| GCR | 481,628 | 481,617 | 11 | .0023% |
| McPhee #2 | 481,629 | 481,616 | 13 | .0027% |

tricts. The least successful plan, however, was off by only thirty-one one-thousandths of a percent.

To select one plan over another on the basis of population equality when only sixteen one-thousandths of a percent separates the five major plans presented to the Court ignores the realities of "fair and effective representation." We refuse to relegate congressional redistricting to a hair splitting game in which the citizens of the state emerge as the only real losers. We must therefore rely on the other criteria to draw some important distinctions between these plans.

Each of the plans submitted to the Court was carefully analyzed on the basis of the second constitutional criteria, the absence of racial discrimination and the non-dilution of minority votes. The State of Colorado has a combined minority population of 16.9% which is concentrated in three major areas. Exhibit 33(a). The City and County of Denver supports both a substantial Black and Hispanic population. Large groups of Hispanics also reside in the City of Pueblo, elsewhere in Pueblo County and in the San Luis Valley located in the south central portion of the state. Exhibits 13, 14 and 32(a). The manner in which each of the proposed plans deals with these centers of minority population is an important factor in determining their constitutionality and credibility.

None of the plans shows any evidence of invidious racial discrimination. At least one, however, raises questions regarding the dilution of minority votes. H.B. 1624, submitted by the Carstens plaintiffs, includes a significant split of the minority populations in both Denver and Pueblo. This plan divides the Denver community in

half and likewise splits Pueblo along an irregular configuration.

Although Carstens plaintiffs admit that the Denver metropolitan area represents the only concentration of minority strength sufficient to create a relatively strong minority district, they claim that H.B. 1624 splits Denver in order to "enhance" minority votes. This alleged enhancement is accomplished by adding the growing minority population in western Adams county [40] to the large minority population residing in northeast Denver.[41] Thus, Carstens plaintiffs claim that District 1 of H.B. 1624 encompasses substantially all of the expected minority population growth in the Denver metro area in the coming decade. They strongly suggest that "the affirmative goal of having a district that will be one in which a Black-Hispanic minority finally achieves such strength as to guarantee representation of their choice is plainly obtainable under H.B. 1624." Carstens Closing Argument at p. 5.

We have thoroughly examined the minority population statistics for the Denver area and have carefully reviewed the testimony at trial. On the basis of this evidence, we are not persuaded by the arguments of the Carstens plaintiffs. No one will deny that the enhancement of minority voting strength is a worthy goal. The experts at trial agreed, however, that the benefit obtained through a 3 to 5% increase in the minority population in H.B. 1624's first congressional district was far outweighed by the detrimental impact of splitting the City and County of Denver into several districts.[42]

■ As a general rule, minority voting strength is impermissibly diluted when

---

**40.** David Prince, former Colorado state demographer, testified at trial on the growth of minorities in Adams County. According to Prince, the Hispanic population grew from 26,277 in 1970 to 38,470 in 1980 for a total of 46.4% over the ten year period. The Black population rose from 1355 in 1970 to 6307 in 1980 for a total ten year growth rate of 365%. Minorities currently represent 20% of the total population of Adams County.

**41.** Prince also testified as to changes in Denver's minority population. From 1970 to 1980, the Black population increased from 47,011 to 59,252 or a total of 26%. The Hispanic population over the same ten year period rose only 6.5% from 86,345 to 91,937. Minorities currently comprise 32.98% of the total population of the City and County of Denver.

**42.** *See* discussion of testimony at p. 89, *infra.*

large concentrations of minority population are necessarily fragmented and disbursed. *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976); *Mississippi v. United States,* 490 F.Supp. 569, 581 (D.C.D.C.1979). H.B. 1624 severs traditional Hispanic communities in west Denver, placing part of them in the first district and part of them in the sixth district. The split is made to achieve a 3 to 4% increase in the minority population in H.B. 1624's first congressional district relative to the other plans.[43] If this increase made a meaningful impact on minority voting strength, we might be more receptive to the position of the Carstens plaintiffs. But the fact remains that a minority population must have a majority of 60 to 65% of the voters in a district in order to exercise political control over that district. *United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629

(1976). Unfortunately, it is mathematically impossible to design a district in Colorado in which minorities are "guaranteed representation of their choice." *Cf.* Carstens' Closing Argument at p. 5. Even allowing for substantial growth in the minority population during the next decade, it is unlikely that the minority population in this district will even begin to approach the 60–65% goal. Drawing district lines to enhance minority representation thus becomes a hollow concept, particularly when the 3–4% enhancement in one district is accomplished at the cost of 5–6% reduction in another.[44]

Carstens plaintiffs contend that the split through the city and county of Pueblo similarly enhances minority voting strength in the third district.[45] The evidence submitted at trial, however, belies this claim.[46] The district lines which wind and twist through southern Colorado succeed in consolidating

---

**43.** The total minority population (Black, Hispanic, Asian, American Indian, Aleut or other) in the first congressional district of each major plan is as follows:

| | | |
|---|---|---|
| H.B. 1624 | 36.6% | (Exhibit 33c) |
| Goens | 32.5% | (Exhibit 33e) |
| GCR | 33.4% | (Exhibit 33b) |
| Governor's Proposal A | 31.8% | (Exhibit 33d) |
| McPhee #2 | 37.1% | (Exhibit 33f) |

*See also* Exhibits 18a–d.

**44.** The total minority population in the second congressional district of each major plan is as follows:

| | | |
|---|---|---|
| H.B. 1624 | 7.19% | (Exhibit 33c) |
| Goens | 16.2% | (Exhibit 33e) |
| GCR | 13.9% | (Exhibit 33b) |
| Governor's Proposal A | 15.0% | (Exhibit 33d) |
| McPhee #2 | 7.5% | (Exhibit 33f) |

*See also* Exhibits 18a–d.

**45.** H.B. 1624's Fifth District is comprised of El Paso, Teller, Elbert Counties, and portions of Pueblo, Fremont and Arapahoe Counties. Carstens plaintiffs argue that "taking the GCR Plan as a basis of comparison, [the Fifth District in] H.B. 1624 contains 45% more minorities, Goens contains no greater minority representation and the Governor's Plan contains only 27% more minorities. Thus, H.B. 1624 set up a second major concentration of minority population in that district which included El Paso County—*the only county in Colorado which is covered by the Voting Rights Act*". Carstens Closing Argument p. 7 (emphasis in original).

**46.** First, Carstens' argument that H.B. 1624 demonstrates "sensitivity to the Voting Rights Act's concern for racial representation by combining Black voting strength in El Paso County with minorities in other immediately contiguous areas" is not persuasive. *See* Carstens Closing Argument p. 7–8. The determination that a county is subject to preclearance requirements under the Voting Rights Act is made on the basis of minority population and voter registration in that specific county. The placement of a preclearance county in a particular congressional district has absolutely no bearing on the county's status under the Voting Rights Act. *See* note 36a, *supra.*

Second, Exhibit 33, prepared by the Carstens plaintiffs, demonstrates that their enhancement of minority population in the Fifth District will not have a meaningful impact on minority strength and was accomplished at the expense of minorities in the Third District.

| Plan | Minority Population District 3 | Minority Population District 5 |
|---|---|---|
| H.B. 1624 | 16.9% | 17.1% |
| Goens | 19.4% | 12.5% |
| GCR | 20.0% | 13.1% |
| Governor's Proposal A | 19.2% | 16% |
| McPhee #2 | 13.3% | 19.7% |

As we explained when a similar situation arose in H.B. 1624's First Congressional District, a meaningless enhancement of minority strength in the district is not sufficient to justify a major division of a substantial minority population.

the Hispanic population of western Pueblo County and the San Luis Valley in District 3 while placing the Hispanics in Las Animas County in District 4 and the Hispanics in the eastern half of Pueblo County in District 5. As a result, H.B. 1624 fractures the southern Hispanic community more than any other plan before this Court.

Thus, after examining the second constitutional criteria, we are no closer to selecting a plan which provides fair and effective representation for the people of Colorado than we were before. While H.B. 1624 has the lowest population deviation, it is the least desirable in terms of minority representation. At least two of the other plans, the Governor's Plan and Goens Plan, also make minor splits in Denver which affect traditional minority communities.[47] While these splits are probably not sufficient to dilute minority voting strength, they detract from the overall acceptability of these plans. Since we are unable to make meaningful distinctions between the five major plans on the basis of constitutional standards, we will examine them in light of our non-constitutional criteria.

B. The Non-Constitutional Criteria

■ Compactness and contiguity represent the first and probably the least significant of the three non-constitutional criteria which we have adopted. Since both of these concepts focus primarily on the geographic shape of the proposed districts rather than on substantive aspects of representation, there is more flexibility in their application. Both were originally designed to represent a restraint on partisan gerrymandering and should be used with this thought in mind.

■ The compactness requirement specifies that the boundaries of each congressional district shall be as short as possible.[48] Although there are several ways to measure compactness, one of the most accurate is "to determine the smallest circle into which the district can be circumscribed and to compare the ratio of the area of the district inside the circle to the area of the circle itself." American Bar Association Special Committee on Election Law and Voter Participation, *Congressional Redistricting* 13 (1981) [hereinafter referred to as "*Congressional Redistricting*"]. The closer these figures come to a 1 to 1 ratio, the more compact the district will be.[49]

In a practical sense, the compactness of a congressional district will be directly affected by the density and distribution of a state's population. Since population requirements have priority, compactness must often be sacrificed in order to achieve an acceptable range of population deviation. Compact districts do, however, reduce electoral costs (in both time and money) and increase the opportunities for more effective representation by concentrating a congressperson's constituency in an easily accessible area. *Congressional Redistricting* at 13.[50]

■ The courts which have utilized the compactness criteria have almost always considered contiguity as well. *See e.g., Dunnell v. Austin*, 344 F.Supp. 210 (E.D. Mich.1972); *Preisler v. Secretary of State of Missouri*, 341 F.Supp. 1158 (W.D.Mo.

47. The minority effect of the Denver split in the Governor's Plan is illustrated in Exhibits 17b and 16f and g. The minority effect of the Denver split in the Goens Plan is illustrated in Exhibits 17d and 16f and g.

48. Although there is no federal constitutional standard requiring compact districts, more than half of the states include compactness as a constitutional or statutory criteria for state legislative districting. *See* Adams, *A Model State Reapportionment Process: The Continuing Quest for 'Fair and Effective Representation'*, 14 Harvard Journal on Legislation 825, 848 (June, 1977) [hereinafter referred to as

"Reapportionment Process"]. Some of those state provisions also apply to congressional redistricting. *See e.g., Shayer et al. v. Kirkpatrick, et al.*, 541 F.Supp. 922 (W.D.Mo.1982) and Mo.Const. art. 3, § 45.

49. A second method of measuring compactness is to compare the aggregate linear distance of the boundaries of each district. *See* Colo. Const. art. V, § 47.

50. See also *Shayer, et al. v. Kirkpatrick, et al.*, 541 F.Supp. 922 at 933, (W.D.Mo.1982).

1972). This factor specifies that "no part of one district be completely separated from any other part of the same district." Dixon, *Fair Criteria and Procedures for Establishing Legislative Districts*, 9 Policy Studies Journal 839, 847 (Special Issue # 3, 1980–81) [hereinafter referred to as "*Criteria and Procedures*"]. The universal acceptance of the need for contiguous congressional districts indicates the pragmatic character of this requirement.[51]

None of the plans submitted to the Court can be seriously challenged on either of these criteria. The demographics of the State of Colorado are such that the Denver metropolitan districts will be extremely compact while the west slope and eastern plains districts will be quite large. The geographic size of these larger districts cannot be significantly reduced due to the sparse population of these areas. Since each of the plans contained six properly contiguous districts, the first category of non-constitutional criteria has not been helpful in distinguishing among the proposed plans.[52]

■ The next category focuses on the preservation of county and municipal boundaries. These political subdivisions should remain undivided whenever possible because the sense of community derived from established governmental units tends to foster effective representation.[53] *See Dunnell v. Austin*, 344 F.Supp. 210 (E.D. Mich.1972); *Skolnick v. State Electoral Board of Illinois*, 336 F.Supp. 839 (1971); *Maryland Citizens Committee for Fair Congressional Redistricting, Inc. v. Tawes*, 253 F.Supp. 731, *aff'd. sub nom., Alton v. Tawes*, 384 U.S. 315, 86 S.Ct. 1590, 16

L.Ed.2d 586 (1966). Unnecessary fragmentation of these units not only "undermines the ability of constituencies to organize effectively but also ... increases the likelihood of voter confusion regarding other elections based on political subdivision geographics." *Congressional Redistricting* at 12.

■ The priority given to population equality makes the division of some county and municipal lines unavoidable. It is less certain, however, when faced with the choice of preserving county or municipal boundaries, which of these boundaries should prevail. As a general rule, county lines are more meaningful in sparsely populated areas because the residents rely on the county government to provide all necessary services. Municipal boundaries, on the other hand, take precedence in densely populated areas. These local units of government represent logical centers of community interest for urban residents who identify more closely with municipal rather than county services. *See David v. Cahill*, 342 F.Supp. 463, 469 (D.C.N.J.1972).

■ The State of Colorado is divided into 63 counties which range in population from 408 to almost 500,000. Exhibits 21 and 21A. It is inevitable that some county and municipal boundaries will be split when congressional districting lines are drawn. We believe, however, that any splits in city and county boundaries should be made in a rational manner which attempts to minimize divisions in these local governmental units. The two areas of prime concern in this regard are Denver and Pueblo.

---

51. Almost two-thirds of the states have constitutional or statutory provisions which specify continguity as a criteria in state legislative redistricting. *See Reapportionment Process* at 848.

52. We do note, however, that the geographic configuration of the districts in H.B. 1624 would permit all six congressional representatives to reside within sixty miles of the Denver Metropolitan area. The possibility of such concentrated representation is not a desirable feature of this plan. *See* trial testimony of Representative Ronald Strahle.

53. "The village or township is the only association which is so perfectly natural that, wherever a number of men are collected, it seems to constitute itself.

  \*   \*   \*   \*   \*   \*

[Municipalities] form a complete and regular whole; they are old; they have the support of the laws and the still stronger support of the members of the community, over which they exercise a prodigious influence."
A. De Tocqueville, *I Democracy in America* 60–61 (1945).

The current population of the City and County of Denver is 492,365. Exhibit 21A. Since the ideal population of a new congressional district is 481,622.5, approximately 3%[54] of Denver's population must be severed from the city in order to achieve population equality. We are of the view that few, if any, of the plans submitted to the court split Denver in a desirable location.

▉ The Goens Plan makes this "required" split in the northwest corner of the city, while the Governor's Plan removes an area from the north central section of Denver. Evidence at trial indicated that both of these splits were undesirable because they separated a significant minority population within Denver.[55] For this reason, we conclude that neither plan embodies the most rational division of the City and County of Denver.

H.B. 1624 and the McPhee Plan # 2 split Denver for the alleged purpose of enhancing minority votes in the first congressional district. As we noted earlier, the 3 to 4% increase in minority population is not enough to have a significant impact on the election. In addition, there was substantial evidence presented at trial which indicated that bisecting the City and County of Denver was not conducive to fair and effective representation. State Senator Ted Strickland, Chairman of the Legislature's Interim Committee on Congressional Redistricting, testified that the unique nature of Denver's problems presented a "compelling reason" for maintaining the city as one congressional district. Denver City Council President William Roberts elaborated on these problems when he explained the very different

philosophies held by Denver and its suburbs with regard to housing, schools, employment and social services. This point was also reiterated in the affidavit of Cathy Reynolds, Denver City Councilwoman-at-large and representative of the National League of Cities. She emphasized that the division of loyalties which would result from splitting Denver into two districts would only "help perpetuate an already existing urban-suburban split and . . . weaken Denver's strength. . . . [The city's] governmental structure, . . . taxing ability, . . . location and . . . services not only provide internal bonds within [its] citizenry, but [also] make it practical and logical for [Denver] to have one strong voice in the U. S. House of Representatives." Exhibit 38B.[56] As a result, we believe that the division of Denver which appears in H.B. 1624 and McPhee Plan # 2 lacks vision and an understanding of the objectives of effective and accountable congressional redistricting.

One of the most controversial issues at trial involved the status of Pueblo County in the new redistricting plan. Considerable evidence was presented on the importance of keeping both the city and the county of Pueblo intact. See Exhibits 38d and 42.[57] The only two plans which split this area are H.B. 1624 and McPhee Plan # 2. H.B. 1624 divides the city and the county in half along a "subterranean geological formation" known as the hogback. The McPhee Plan, on the other hand, splits Pueblo in the southwest corner of the county. Carstens plaintiffs maintain that these "sacrifices" were necessary to prevent Pueblo from dominating the western slope district.

---

54. Within the geographic perimeters of the City and County of Denver are several islands of population which are under the jurisdiction of Arapahoe County. In order to insure contiguous congressional districts, the 5759 residents of these Arapahoe enclaves must be included in a district with Denver. As a result, Denver's population for districting purposes becomes 498,124 or 16,501.5 more than is necessary for a single congressional district. See Exhibit A and Appendix II, infra.

55. See Exhibits 16f, 16g, 17b and 17d.

56. A division of Denver would also weaken important neighborhood community groups. Kathy Cheever, an active member of Inter-Neighborhood Cooperation, testified at trial that there are currently 80 registered neighborhood organizations in the City and County of Denver. See Exhibit 36. H.B. 1624 would place twenty-seven of these organizations in one congressional district, forty-two in another district and split the remaining eleven in some manner. This division would be extremely harmful to the effectiveness of these groups.

57. See text and accompanying notes at pp. 91–92.

We do not believe that a reasonably fair and effective congressional redistricting plan should "sacrifice" any county in the state. Pueblo's 125,972 citizens represent approximately one-fourth of the population needed to create a congressional district. If the county is kept intact, Pueblo will account for only 26% of the population in any district in which it is located. The remaining counties would therefore have a 3 to 1 advantage over Pueblo in population and could effectively counter any concerted effort by Pueblo to unduly influence representation of the area.

Every major plan submitted to the Court splits at least five counties.[58] Although most of these splits are necessary to achieve population equality, they are frequently made without regard to the impact such a split would have on the representation of the divided communities. For example, the GCR plan splits Boulder County by placing the northeast corner in a predominantly agricultural district. The City of Boulder, however, is playing a central role in the development of this entire area. As a result, we feel that the needs of these people are better served by a united Boulder County.

Similarly, the GCR Plan makes an obscure split in Las Animas County (located in Southern Colorado). This split does not appear to reflect any particular geographic, demographic or economic consideration. In such a sparsely populated, predominantly rural community where the citizens depend upon the county for important services, an unexplained split of even a minimal number of citizens does not represent desirable redistricting strategy.

Each of the major plans submitted to the Court also split several municipalities.[59] While many of these divisions were made along county lines, we feel that consideration should have been given to the significance of the county lines within those communities. Dividing a congressional district along these lines is logical only for the sake of convenience. When the divided municipality is located in a densely populated area, we believe that the citizens identify more strongly with the services provided by the municipality. As a result, the principle of fair and effective representation would be better served in these circumstances by maintaining the integrity of municipal boundaries.

After carefully examining all of the proposed plans under our second non-constitutional category, no plan can claim any particular advantage over the others. For every desirable element in a proposed plan, there is an equal number of undesirable features. We therefore turn to our third non-constitutional category for additional direction.

**58.** The following table compiled from Exhibits 30 and 34a–d contains a listing of each plan and the counties split:

| Plan | No. of Counties Split | Counties Split |
|---|---|---|
| H.B. 1624 | 6 | Arapahoe, Boulder, Denver, Fremont, Jefferson and Pueblo |
| Goens Plan | 5 | Arapahoe, Custer, Denver, Jefferson and Weld |
| GCR Plan | 6 | Adams, Arapahoe, Boulder, Denver, Jefferson and Las Animas |
| Governor's Plan A | 5 | Adams, Arapahoe, Denver, Jefferson, Las Animas |
| McPhee Plan #2 | 8 | Adams, Arapahoe, Boulder, Denver, El Paso, Jefferson, Larimer, Pueblo |

**59.** The following table compiled from Exhibit 30 contains a listing of each plan and the municipalities split:

| Plan | No. of Municipalities Split | Municipalities |
|---|---|---|
| H.B. 1624 | 8 | Arvada (along county lines), Aurora, Bow Mar (along county lines), Broomfield (along county lines), Denver, Greenwood Village, Pueblo, Westminster (along county lines) |
| Goens | 5 | Arvada (along county lines, Aurora, Denver, Broomfield (along county lines); Westminster (along county lines) |
| GCR | 2 | Aurora (along county lines), Denver |
| Governor's Proposal A | 2 | Aurora, Denver |

"No one denies that a concept of 'community of interest' can and does apply to congressional redistricting, since formulating a plan without any such consideration would constitute a wholly arbitrary and capricious exercise." Carstens Closing Argument, p. 3. Disputes about this third category center, instead, on the definition of the term "communities of interest" and its relevance to the State of Colorado. For our purposes, communities of interest represent distinctive units which share common concerns with respect to one or more identifiable features such as geography, demography, ethnicity, culture, socio-economic status or trade. We are convinced that a plan which provides fair and effective representation for the people of Colorado must identify and respect the most important communities of interest within the state.

There is substantial agreement among the parties that Colorado should have a consolidated eastern agricultural district. Thus, the Governor's Plan, which divides the state's eastern counties into two separate districts[60] is immediately placed at a considerable disadvantage. While the remaining plans essentially unite all of the eastern counties, there are a few additions and exclusions which detract from the concept of a consolidated agricultural district. H.B. 1624, for example, fails to include the two prominent southeastern agricultural counties of Crowley and Otero in its eastern plains district. The plan similarly ignores the agricultural concerns of eastern Arapa-hoe and Adams Counties. The Goens Plan, on the other hand, places Jackson County in its eastern plains district when this mountainous area has few, if any, common interests with rural farming communities.

The parties also agree that the predominantly mountainous counties in the western portion of the state should be consolidated, if at all possible. Ideally, this western slope district would include only counties west of the Continental Divide. Unfortunately, population standards require that some front range counties be placed in this district.[61] The choices made by the drafters of each plan submitted to the Court in this regard reflect policy decisions which often conflict with court-adopted criteria.

The McPhee Plan # 2 was presented to the Court as a plan which truly respected geographic communities of interest within the state. See Exhibit 41. McPhee's theory mirrors the ideal in that it attempts to group all mountainous areas west of the front range into one district. As a result, the McPhee Plan places a small portion of every major front range county into a western slope district.[62] Testimony at trial demonstrated, however, that mountains are only important as they affect people. The people east of the Continental Divide have some very different concerns which frequently conflict with those of the people who reside on the western slope.[63] Moreover, in its attempt to respect geographic communities of interest, the McPhee Plan divides more counties than any other plan submitted to the Court and also achieves

---

Comparable information on McPhee Plan # 2 is not contained in Exhibit 30.

**60.** Although every expert questioned on the viability of an agricultural district felt that it made sense and should be incorporated into a plan, the Governor's Proposal A splits the eastern counties in half along the South Platte drainage pattern. The resulting fourth district is predominantly rural farming areas but the fifth district combines the mountainous Chaffee, Park and Teller Counties with the growing metropolitan El Paso County and heavily agricultural areas to the east and southeast.

**61.** The combined population of the 22 counties west of the Continental Divide is 287,595 or 194,026.5 short of the ideal population for a congressional district.

**62.** The following table illustrates the fragmentation of five major front range counties under the McPhee Plan # 2:

| County | Total Population | Persons Placed In West Slope District | Percentage |
|---|---|---|---|
| Larimer | 149,184 | 9577 | 6.5% |
| Boulder | 189,625 | 8074 | 4.25% |
| Jefferson | 371,741 | 24403 | 6.5% |
| Pueblo | 125,972 | 11799 | 9.33% |
| El Paso | 309,424 | 2534 | .8% |

**63.** The greatest potential for conflict arises over the transmountain diversion of water from the western slope to the eastern front range.

the largest population deviation.[64] While we believe that communities of interest are an important factor in drawing fair and effective congressional districts, we are not prepared to recognize this criterion to the exclusion of all others.

H.B. 1624 also reaches well into the front range to achieve the population necessary for a western slope district.[65] The most objectionable feature of this plan is the manner in which it splits Pueblo. Carstens plaintiffs contend that Pueblo, or a portion of it, should be placed with El Paso County, its northern neighbor. We are not convinced, however, that this arrangement is in the best interests of the people of either county. These two areas share no strong communities of interest with the exception of the transportation concerns generated by a common highway and rail system. Pueblo is the only heavily industrial region in the state, while El Paso County supports a predominantly technical community. The current statistics relating to housing start-ups demonstrate that Pueblo is a low or negative growth county. El Paso, on the other hand, is a high growth area.[66] Historically, these counties are commercial rivals and were characterized by the drafter of one plan as "hereditary enemies." See Exhibit 41, p. 5. The competitive atmosphere between these two counties is contrary to the concept of communities of interest. We are persuaded that Pueblo and El Paso do not belong in the same congressional district.

The Governor's Plan leaves Pueblo intact and places it in a western slope district with the San Luis Valley. Testimony at trial indicated that Pueblo had considerably more amicable ties to the western slope than any other front range population center.[67] The county's large Hispanic population has strong traditional ethnic and cultural bonds with the San Luis Valley to the southwest. Pueblo is the primary trade, religious and educational center for the Valley which supplies much of Pueblo's labor force. Because Pueblo is not experiencing rapid growth, its water requirements are stable, and conflict with the western slope over transmountain diversion of water would be kept to a minimum.

The western slope district of the Governor's Plan has at least one major disadvantage, however, in that it includes the front range counties of Gilpin and Clear Creek. While both of these counties are mountainous, their primary ties are with Boulder, Jefferson and Denver in the east. For example, both counties are included in a judicial district with their eastern neighbors. We are of the view that an acceptable redistricting plan should respect the front range orientation of Gilpin and Clear Creek Counties.

After examining each of the plans with respect to our criteria, we have not been able to select one plan which substantially complies with all of our objectives. Each of the proposed plans appears to satisfy constitutional requirements. On balance, no one

---

64. *See* notes 39 and 58, *supra.*

65. Southern Jefferson County, Douglas County and Park County are all included in H.B. 1624's western slope.

66. According to the testimony of Dr. Alan Love, the 1980 census data indicates housing start-ups in Pueblo and the San Luis Valley range from 10.4% to 30.4% while El Paso County starts ranged from 50% to 230%.

67. Dr. Alan Love, Professor of Political Science and Dean of Liberal Arts at the University of Southern Colorado, testified at trial as an expert on communities of interest in Pueblo and the surrounding areas. He reviewed statistics focusing on the income and education of the residents in this area, the concentration of minority groups and general changes in popula-

tion. From this data, he concluded that Pueblo has a "stronger community of interest with the San Luis Valley" than with El Paso County, its northern neighbor.

Similarly, Jennie Sanchez, a plaintiff in this lawsuit and a long time resident of the San Luis Valley identified seven separate communities of interest shared by Pueblo and the Valley. These include: employment (Valley residents seek work in Pueblo); religion (the Valley, which is included in the Diocese of Pueblo is approximately 40% Catholic); education (University of Southern Colorado and Pueblo Vocational Community College are located in Pueblo and used by Valley residents;) and, health (Pueblo and the Valley share several hospitals and medical facilities).

plan represents the best effort at providing fair and effective representation for the people of Colorado because each plan has several undesirable elements which tend to outweigh any advantages. Therefore, the Court has fashioned its own plan which attempts to satisfy the relevant legal criteria and incorporate the most desirable aspects of each plan presented to the Court.

## VI

## THE 1982 COLORADO CONGRESSIONAL REDISTRICTING PLAN

We adopt the 1982 Colorado Congressional Redistricting Plan appended to this opinion and marked as "Exhibit A." This plan creates the following districts:

DISTRICT 1 incorporates the City and County of Denver with the exception of approximately 16,500 persons in the extreme southwest corner of the city. It also includes the Arapahoe County enclaves found within the Denver city limits.[68]

DISTRICT 2 includes Boulder, Gilpin and Clear Creek Counties, northeast Jefferson County, and western Adams County. The cities of Arvada, Broomfield, Federal Heights, Northglenn, Thornton and Westminster are all left intact.

DISTRICT 3 is the largest district in the 1982 Plan. In addition to every county west of the Continental Divide,[69] it contains Jackson, Pueblo and southern Fremont Counties along with those southern counties which comprise the San Luis Valley.[70] It does not include Las Animas County.

DISTRICT 4 is comprised of all major agricultural counties in eastern Colorado, including the greater parts of Adams and Arapahoe Counties. The district extends from Larimer County in the north to Las Animas County in the south.[71]

DISTRICT 5 contains the following counties located in the mountainous front range region of central Colorado: El Paso, Chaffee, Lake, Park, Teller, northern Fremont, Elbert, Douglas, central and south Jefferson, and a small portion of southwest Arapahoe.

DISTRICT 6 is comprised of those suburban municipalities found in Jefferson, Arapahoe and Adams Counties which surround Denver on the west, south, and east. Included in their entirety are the cities of Aurora, Bow Mar, Cherry Hills, Columbine Valley, Edgewater, Englewood, Lakewood, Lakeside, Littleton, Sheridan, and Wheat Ridge. A small portion of southwest Denver is also found in this district.

Appendix I illustrates in map form all of the districts delineated by the 1982 Congressional Plan. Appendix II highlights the Denver Metropolitan Area and Vicinity, and Appendix III defines the division of Fremont County.

Taken as a whole, the 1982 Plan satisfies the criteria adopted by this Court for redistricting Colorado. *First*, the Plan falls easily within the constitutional requirement of equal population in all the districts. *Second*, the Plan does not discriminate against minority voters and attempts, wherever practicable, to preserve traditional minority communities. *Third*, all of the districts within the Plan are reasonably compact and contiguous. *Fourth*, recognition was given to the importance of municipal boundaries in highly populated areas. To

---

**68.** *See* note 54, *supra*. The Arapahoe County enclaves, including Glendale, have a total population of 5,759. Exhibit A and Appendix II, *infra*.

**69.** The following counties or portions thereof are located west of the continental divide: La Plata, Montezuma, Dolores, San Miguel, Ouray, Montrose, Gunnison, Mesa, Delta, Garfield, Pitkin, Eagle, Summit, Rio Blanco, Moffat, Routt, Grand, Archuleta, Mineral, Hinsdale, San Juan, and Saguache.

**70.** The San Luis Valley generally includes the following counties: Huerfano, Alamosa, Conejos, Rio Grande, Archuleta, and Mineral.

**71.** In addition to Larimer County and Las Animas County, District 4 includes the following counties: Weld, Morgan, Logan, Sedgwick, Phillips, eastern Adams, eastern Arapahoe, Washington, Yuma, Lincoln, Kit Carson, Cheyenne, Crowley, Otero, Kiowa, Bent, Prowers, and Baca.

this end, rapidly growing communities such as Westminster and Aurora in the Denver area are kept intact. *Fifth*, the 1982 Plan achieves a balance among the many communities of interest affected by congressional redistricting. Most important among these are an "east plains" and a "west slope" district, the inclusion of a consolidated Pueblo with the San Luis Valley, and a consolidated City and County of Denver.[72]

## A. Population Equality

The 1982 Plan contains a total deviation from the ideal district population of 12 persons, or approximately .0025%. This deviation is clearly within the constitutional parameter set by the Supreme Court. *See* Section V, *supra.*

Only one plan submitted to this Court achieved a more equal balance between the six districts. H.B. 1624 had a total deviation of 7 persons, or approximately .0015%. This figure, however, is merely ten one-thousandths of a percent lower than the total deviation achieved by the 1982 Plan. Given the natural margin of error in the actual census figures,[73] there is no appreciable difference between the two plans in terms of population equality.

## B. Non-Dilution of Minority Votes

While several of the plans urged upon this court raised the spectre of diluting traditional minority communities, the 1982 Plan attempts wherever practicable to preserve those communities. The congressional districts in the 1982 Plan contain minority populations which range from 9.76% to 33.4%.[74] Due to the large concentrations of minorities in Denver and Pueblo, it is impossible to match the state average of 16.9% minority population in every district, but the 1982 Plan compares favorably with the other plans submitted to the Court.[75]

We felt that it was particularly important to avoid diluting the concentration of minority strength in the City and County of Denver. As noted earlier, the principle of population equality requires a split of at least 16,500 persons from this area. The 1982 Plan makes this minimal division in

72. An additional advantage of the 1982 Plan is that it enhances prospects for a strong geographic spread in congressional representation. In other words, because many of the major population centers are not in close proximity to each other (*e.g.* Grand Junction, Pueblo, Fort Collins, Denver), all six congressional Representatives cannot reside in the Denver metropolitan area. *See* note 52, *supra.*

73. *See Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); *Wells v. Rockefeller*, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969); and note 85, *infra.*

74. The six districts under the 1982 Plan contain the following minority populations:
*District 1:* Black—59,326 (12.32%); Indian, Eskimo and Aleut—3,834 (.80%); Asian and Pacific Islanders—7,009 (1.45%); and Hispanic—90,888 (18.87%); Total Minority Population—161,057 (33.4%).
*District 2:* Black—3,919 (.81%); Indian, Eskimo and Aleut—2,488 (.52%); Asian and Pacific Islanders—5,230 (1.08%); Hispanic—41,944 (8.71%); Total Minority Population—53,581 (11.12%).
*District 3:* Black—3.192 (.66%); Indian, Eskimo and Aleut—5,004 (1.04%); Asian and Pacific Islanders—1,558 (.32%); Hispanic—82,238 (17.07%); Total Minority Population—91,992 (19.1%).

*District 4:* Black—2,363 (.50%); Indian, Eskimo and Aleut—2,060 (.43%); Asian and Pacific Islanders—3,373 (.70%); Hispanic—65,850 (13.67%); Total Minority Population—73,646 (15.30%).
*District 5:* Black—19,806 (4.11%); Indian, Eskimo and Aleut—2,442 (.51%); Asian and Pacific Islanders—5,960 (1.24%); Hispanic—32,291 (6.70%); Total Minority Population—60,499 (12.56%).
*District 6:* Black—13,057 (2.71%); Indian, Eskimo and Aleut—2,124 (.44%); Asian and Pacific Islanders—6,635 (1.38%); Hispanic—25,184 (5.23%); Total Minority Population—47,000 (9.76%).
Compiled from Exhibit 22.

75. The state average of 16.9% minority population is based on the approximate numbers of Blacks (3.5%); American Indian, Eskimo and Aleuts (0.6%); Asian and Pacific Islanders (1.0%); and persons of Spanish origin (11.8%) in Colorado following the 1980 decennial census. Exhibit 33(a), *also* Exhibit 18(a)-(d).
H.B. 1624 had minority populations ranging from 7.19% to 36.6%; McPhee Plan # 2 from 7.5% to 37.1%; Governor's Proposal A from 7.4% to 31.8%; GCR Plan from 8.7% to 33.4%; and the Goens Plan from 8.9% to 32.5%. Exhibit 33(b)-(f).

southwest Denver and thus, to the greatest extent possible, avoids disturbing traditional minority communities. As a result, the congressional district which encompasses the City and County of Denver (District 1) contains slightly over thirty-three percent Black and Hispanic residents.

We also paid close attention to the minority population in Pueblo County for two reasons. First, a very large Hispanic population is spread throughout the City of Pueblo. Any attempt to concentrate this Hispanic population into one congressional district results in a winding, twisting district line which unnecessarily fragments the remainder of the city. Second, there was extensive testimony at trial indicating an historical and practical link between the minority population in Pueblo and the San Luis Valley. See Sec. VI, supra. A division of Pueblo County between two congressional districts invalidates that historic connection and potentially dilutes minority votes in both districts. For these reasons, we followed a pattern used by many of the proposed plans and included all of Pueblo County with the San Luis Valley in the western slope. This district achieves approximately a nineteen percent minority population, second only to District 1.

C. Compactness and Contiguity

Like all the plans submitted to the Court, the 1982 Plan includes very compact districts in the Denver metropolitan area and very large eastern and western districts. These differences reflect the demographic reality that eighty percent of the population of Colorado is centered in the front range counties. Thus, the districts range in size from one county (District 1) to thirty-one counties (District 3). All of the districts in the 1982 Plan are contiguous.

D. Preservation of County and Municipal Boundaries

The 1982 Plan attempts to recognize the importance of both county and municipal boundaries by respecting their integrity to the greatest extent possible given population requirements. The City and County of Denver is the clearest example of this principle. As the capital of Colorado, Denver has the largest population of any county in the state. It is one of the leading economic, cultural, and transportation centers in the western United States. It is also a center of administrative activity for the federal government. The boundaries of the City and County of Denver are co-extensive and are explicitly defined in the Colorado Constitution. See Colo.Const. art. XX, § 1 (1973). Moreover, the geographic growth of Denver is severely limited by a constitutional amendment.[76] These practical considerations coupled with persuasive testimony at trial underscore the need to keep Denver as a single congressional district. The 1982 Plan respects Denver's city and county boundaries to the maximum extent possible.

While not constitutionally designated, the boundaries of the rapidly growing municipalities surrounding Denver are no less important. Although several of these densely populated cities are fortuitously split by county lines, those lines should not take precedence over municipal boundaries in this area. By respecting municipal rather than county boundaries in the second congressional district, for example, we prevented the fragmentation of more than 130,000 people in the rapidly growing cities of Arvada, Broomfield and Westminster.

Similarly, almost every plan relied upon the convenience of the Adams-Arapahoe County line to needlessly divide Aurora, the second largest city in the state. The 1982 Plan places a consolidated Aurora in District 6 with the other suburban municipalities surrounding Denver. This is a significant feature of the Plan. Aurora will most likely play a key role in the growth of Colorado over the coming decade and should

---

**76.** The so-called "Poundstone Amendment", adopted in 1974, sets out a limitation on the initiation of annexation and consolidation proceedings with the City and County of Denver.

Among other things, the amendment requires a majority vote approval of a six-member "boundary control commission".

be unified for congressional districting purposes.

Unfortunately, our desire to recognize the important municipal boundaries in the Denver metropolitan area results in a three-way split of Jefferson, Adams and Arapahoe counties. We feel these multiple divisions are justified given the stark contrast between the concerns of the expanding municipalities and the outlying rural areas in these counties. Where municipalities serve as the most logical boundaries, that logic should not be sacrificed at the cost of preserving county lines.

The 1982 Plan also geographically divides Fremont County along an east-west line through Canon City for no other reason than to achieve ideal district population in the 3rd and 5th congressional districts. We would have preferred not to split Canon City, but, because the population of the county is centered in Canon City, that result is unavoidable. Every effort was made to split the city along existing geographic landmarks and impartial census enumerator lines to minimize the confusion inherent in dividing any municipality.[77]

E. Preservation of Communities of Interest

Each district in the 1982 Plan was designed to recognize those communities of interest which emerged during trial as most important to effective congressional representation for the citizens of this state. Where necessary, competing interests were balanced in favor of articulated advantages. The result is six congressional districts which reflect well-defined communities of interest.

District 1 is the City and County of Denver. As a much older core urban area, Denver faces problems not shared by its suburban counterparts. Primary among these are the maintenance, and often replacement, of out-dated facilities such as sewers, streets and viaducts. Additionally, Denver bears the brunt of providing social services, including housing, unemployment, and medical care for much of the metropolitan area. As a single school district, Denver must also confront some aspects of public education which are unique to a core city.

Any split of Denver necessarily divides some existing neighborhood communities. The impact on those communities can be lessened somewhat by the location of that division. Testimony indicated, and we are convinced, that the most logical division is in the Grant Park area of southwest Denver. This split leaves Denver more compact as a congressional district and, more importantly, has a minimal impact on the voting strength of both minority and neighborhood communities.

Just as Denver must deal with the problems inherent in a core city, the surrounding suburban municipalities share common problems incident to young, rapidly growing municipalities. Whereas Denver seeks state and federal assistance to repair and replace services and facilities, the suburbs compete for the same funds to develop and implement relatively new services. The same concerns that place the suburbs in a conflicting posture with Denver form a natural community of interest among all the suburban municipalities. For this reason, District 2 and District 6 of the 1982 Plan seek to consolidate those municipalities.

District 2 combines Gilpin, Clear Creek and Boulder County with the cities in northeast Jefferson and extreme western Adams County. These areas are linked naturally by Highway 36, also known as the Boulder Turnpike. The result is a rapidly growing commercial, technological, and light industrial region with extensive business exchanges between the cities.

District 6 incorporates the remaining cities immediately to the west, south and east of Denver. As noted earlier, the primary advantage of such a district lies in its preservation of municipal boundaries. This

---

**77.** Fremont County was divided utilizing the Arkansas River on the west and State Highways 50 and 115 on the east. Within Canon City the division, as far as practicable, follows Highway 50 and "BNA" census divisions.

district contains two of Colorado's largest and fastest growing cities, Lakewood and Aurora. Consolidation of these cities in the 1982 Plan recognizes the vitality and needs of this region.

There was little, if any, argument at trial that "west slope" and an "east plains" districts should be included in any redistricting plan. Nearly every plan submitted embodied similar configurations for these two large districts.

The "west slope" district under the 1982 Plan (District 3) contains every county west of the Continental Divide. These counties share common concerns of water management, energy production, and environmental conservation. Vast portions of this region are federally owned and controlled which creates a unique relationship with the federal government. *See* Exhibit 8. In addition, Pueblo County and the San Luis Valley are included in District 3. Extensive testimony at trial was directed at demonstrating a natural affinity between Pueblo and the San Luis Valley. *See* Section V, *supra.* No one has contended that those counties have any close connection with agricultural eastern Colorado. Thus, the inclusion of the San Luis Valley in the western slope logically compels the inclusion of Pueblo as well. All of those plans given primary consideration at trial included at least a portion of Pueblo in this region.

District 4 of the 1982 Plan is the so-called "east plains agricultural" district. It is comprised of the major agricultural counties of northern, eastern and southern Colorado. Testimony indicated that eastern Adams and Arapahoe Counties, being dedicated to an agricultural economy, should be included in an east plains district. All of these counties share common concerns over farm production and subsidies, water management, and soil conservation.

District 5 of the 1982 Plan includes those counties in the predominantly mountainous front range region of central Colorado. The focal point of this district is El Paso County and specifically Colorado Springs. The other counties in District 5 rely heavily on Colorado Springs as a trade, communica-

tion and cultural center of the region. In return, Colorado Springs is dependent on the mountainous region for its water and recreation.

## VII

### CONCLUSION

In formulating the 1982 congressional redistricting plan, we have endeavored to form six districts that, as nearly as possible, have exactly equal populations. This result is dictated by the Supreme Court's opinions in *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); *Wells v. Rockefeller*, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969); and *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). *See* Section V *supra.* We have discovered, however, that mathematical precision does not necessarily guarantee fair and effective representation for the people of the state.

The City and County of Denver is an apt illustration of this problem. It is constitutionally defined to be a separate city and county. Colo.Const. art. XX, § 1. The Colorado Constitution also declares it to be a separate school district. Colo.Const. art. XX § 7. According to the 1980 census, Denver's population was approximately two percent greater than one-sixth of the state population. Since Colorado is now entitled to six congressional districts, the City and County of Denver without any additions or deletions, is a logical district.

Yet, according to *Wesberry* and its progeny, we must remove an area of approximately sixteen thousand Denver residents to make the rest of Denver a congressional district. Although this division is supposedly necessary to prevent underrepresentation of Denver residents in the House of Representatives, the result almost certainly will be overrepresentation of Denver residents during the coming decade. From 1970 to 1980 Denver's population declined 4.5% while Colorado's as a whole grew over 30%. Even if this trend has continued at only half of that rate, the population of Denver

is already less than one-sixth of Colorado's. While we realize that the census must be taken on a certain date, it is to be observed that the present attempt to achieve exact population equality is actually leading to less equality than would the now impermissible approach of placing the entire City and County of Denver in one district.[78]

No one will deny that gross population deviations between congressional districts should not be permitted, but we believe that the degree of mathematical precision which requires a minimal split of Denver is neither necessary nor desirable. Almost twenty years ago, Chief Justice Earl Warren noted that "mathematical exactness or precision [was] hardly a workable constitutional requirement. What is marginally permissible in one state may be unsatisfactory in another, depending on the particular circumstances of the case." *Reynolds v. Sims*, 377 U.S. 533, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964). In subsequent cases, however, the Court steadfastly refused to set a permissible range of population deviation and at the same time proceeded to reject plans with ever decreasing deviations in favor of plans which demonstrated an even greater degree of mathematical perfection. District courts, floundering in the absence of any definable deviation standards, began to adopt plans which fell below the lowest deviation accepted by the Supreme Court and reject those which were greater regardless of the actual impact of the plan on representation. Litigants, seeking court approval of their plans, strove to achieve a greater degree of mathematical precision, again without regard to the impact on the quality of representation. Thus, the current overriding and at times illogical dominance of population equality in congressional redistricting is more the result of inadvertent evolution and blind adherence to prior court decisions than of reasoned decision making.

We believe that population equality should be prominent, but only if the variations are over some chosen maximum, which probably should be in the 5–15% range. Below that maximum, population equality should be one factor considered equally with others such as the absence of racial discrimination, compactness and contiguity, preservation of county and municipal boundaries, and preservation of communities of interest in determining the constitutionality of any given redistricting plan. Due to differences in population growth rates and inaccuracies in the census figures, exact population equality is almost certain to be illusory.[79] If a state can present

---

78. An additional advantage to keeping Denver whole is voter identity. Most voters know what city and county they live in, but fewer are likely to know what congressional district they live in if the districts split counties and cities. If a voter knows his congressional district, he is more likely to know who his representative is. This presumably would lead to more informed voting.

79. The Supreme Court has recognized the inherent inaccuracies in census figures on several occasions. In *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), Justice Fortas wrote:

Whatever might be the merits of insistence on absolute equality if it could be attained, the majority's pursuit of precision is a search for a will-o'-the-wisp. The fact is that any solution to the apportionment and districting problem is at best an approximation because it is based upon figures which are always to some degree obsolete. No purpose is served by an insistence on precision which is unattainable because of the inherent imprecisions in the population data on which districting must be based.

*Kirkpatrick v. Preisler*, 394 U.S. 526, 538–39, 89 S.Ct. 1225, 1232, 22 L.Ed.2d 519 (1969) (Fortas, J., concurring).

Similarly, in *Wells v. Rockefeller*, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969), Justice Byron White noted:

Today's decision on the one hand requires precise adherence to admittedly inexact census figures, and on the other downgrades a restraint on a far greater potential threat to equality of representation, the gerrymander. Legislatures intent on minimizing the representation of selected political or racial groups are invited to ignore political boundaries and compact districts so long as they adhere to population equality among districts using standards which we know and they know are sometimes quite incorrect. I see little merit in such a confusion of priorities.

*Wells v. Rockefeller*, 394 U.S. 542, 89 S.Ct. 1234, 1242, 22 L.Ed.2d 535 (1969) (White, J. dissenting).

legitimate justifications for small population variations in a congressional redistricting plan, the federal courts should not intervene merely to achieve an illusion of better equality. *See White v. Weiser*, 412 U.S. at 798, 93 S.Ct. at 2356. (Powell, J., Burger, C. J. and Rehnquist, J. concurring). Instead, we would adopt the same approach that the Supreme Court has used in state legislative redistricting cases, allowing some population variations, if they can be justified by legitimate state interests. *See generally Chapman v. Meier*, 420 U.S. 1, 21–26, 95 S.Ct. 751, 763, 42 L.Ed.2d 766 (1975). ▮ "No right is more precious in a free country than that of having a voice in the election of those who make the law under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 534, 11 L.Ed.2d 481 (1964). In developing the 1982 Congressional Plan, we carefully considered the numerous plans submitted to the Court and endeavored to incorporate the most beneficial aspects of each proposal against the backdrop of constitutional and other recognized criteria. The sum total of our efforts reflects a rational state policy for redistricting Colorado and attempts to provide fair and effective representation for its citizens.[80]

### ORDER

The foregoing memorandum opinion is hereby adopted as this Court's findings of fact and conclusions of law.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant Secretary of State Mary Estill Buchanan's Motion to Dismiss filed on November 18, 1981 is *DENIED.*

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the current congressional districting plan set forth in C.R.S. 1973 § 2–1–101 is unconstitutional.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the 1982 Congressional Redistricting Plan set forth in Exhibit A meets all federal constitutional requirements.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the congressional election processes and congressional primary and general elections for the State of Colorado in 1982 and thereafter be conducted in and from the congressional districts established in this opinion and by Exhibit A.

The composition of the 1982 congressional redistricting plan in terms of population is as follows:

1982 COLORADO CONGRESSIONAL REDISTRICTING PLAN

| DISTRICT | POPULATION | ABSOLUTE DEVIATION | RELATIVE DEVIATION |
|---|---|---|---|
| 1. | 481,628 | + 5.5 | .00114% |
| 2. | 481,617 | − 5.5 | .00114% |
| 3. | 481,625 | + 2.5 | .00052% |
| 4. | 481,616 | − 6.5 | .00134% |
| 5. | 481,627 | + 4.5 | .00093% |
| 6. | 481,622 | − 0.5 | .00010% |

TOTAL POPULATION: 2,889,735
IDEAL DISTRICT POPULATION: 481,622.5
ABSOLUTE MEAN DEVIATION: 4.17
RELATIVE MEAN DEVIATION: .00087%

---

**80.** Those persons assisting in the preparation of base maps of the 1982 Colorado Congressional Redistricting Plan were: Mr. John McLaurin, Center Chief; Mr. George M. Barker, Chief, Branch of Geometronics; Mr. William Alexander, Chief, Office of Technology; and, Mr. Neil C. Colin, Branch of Cartometric Operations, Rocky Mountain Mapping Center, National Mapping Division, United States Department of Interior, Geological Survey, Denver.

We are indebted to these gentlemen, their colleagues, and the federal agency they represent for their assistance and splendid cooperation.

We also acknowledge, with appreciation, the technical assistance and cooperation of Mr. Richard P. Gebhart in the verification of the accuracy of the population figures, the Tract/Block description of the 1982 Plan, and of the district boundary lines drawn by the Court.

Mr. Gebhart is an economist/planner, with substantial experience in population-based data and statistical indices. He is employed by the Denver Regional Council of Governments. However, he was appointed as a technical expert, pursuant to our Order Regarding the Appointment of Technical Expert or Experts entered on December 21, 1981, in his individual capacity. He performed his services for the Court on Sunday, January 17; Monday, January 18; Friday, January 22; and Monday, January 25, 1982.

In the event that there is a conflict between county and census tract descriptions, on the one hand, and boundary lines as shown on the appended maps, the county and census tract descriptions will control.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Defendant Secretary of State Mary Estill Buchanan, in performance of her duties and functions under Colorado election laws, be governed by and comply with said redistricting plan.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Court retains jurisdiction to implement, enforce and amend this order as shall be necessary and just.*

---

* Exhibit A to this Memorandum Opinion and Order, setting out in words and figures the 1982 Colorado Congressional Redistricting Plan, is on file in the Office of the Clerk, United States District Court for the District of Colorado.